FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2018 FEB -6 AM 10: 29

CLERK'S OFFICE
AT GREENBELT

BY  SHP  DEPUTY

Shantanu Jha

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-against-

XCube Research and Development, Inc,
John Roberts, Joseph Trier, Stephen Pytka,

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**Complaint for a Civil Case**

Case No. PX  18CV0364

*(to be filled in by the Clerk's Office)*

Jury Trial:    ☐ Yes   ■ No
*(check one)*

I. **The Parties to This Complaint**

   A. **The Plaintiff(s)**

   Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

   | | |
   |---|---|
   | Name | Shantanu Jha |
   | Street Address | 8521 Meadowlark Lane |
   | City and County | Bethesda, Montgomery County |
   | State and Zip Code | Maryland 20817 |
   | Telephone Number | 617-595-0808 |
   | E-mail Address | dsj@beaconsfieldcapital.com |

   B. **The Defendant(s)**

   Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

   Defendant No. 1

   | | |
   |---|---|
   | Name | XCube Research and Development, Inc |
   | Job or Title (if known) | |
   | Street Address | 12 Pond Lane |
   | City and County | Concord, Middlesex County |
   | State and Zip Code | Massachusetts 01742 |
   | Telephone Number | |
   | E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | John Roberts |
| Job or Title (if known) | |
| Street Address | 136 Musquash Road |
| City and County | Hudson, Hillsborough County |
| State and Zip Code | New Hampshire 03051 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 3

| | |
|---|---|
| Name | Joseph Trier |
| Job or Title (if known) | |
| Street Address | 242 Butter Road |
| City and County | Henniker, Hillsborough County |
| State and Zip Code | New Hampshire 03242 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 4

| | |
|---|---|
| Name | Stephen Pytka |
| Job or Title (if known) | |
| Street Address | 9 Langley Lane |
| City and County | Andover, Essex County |
| State and Zip Code | Massachusetts, 01810 |
| Telephone Number | |
| E-mail Address (if known) | |

*(If there are more than four defendants, attach an additional page providing the same information for each additional defendant.)*

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question          ■ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

_____

_____

_____

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

   a. If the plaintiff is an individual

      The plaintiff, *(name)* Shantanu Jha _____, is a citizen of the State of *(name)* Maryland _____.

   b. If the plaintiff is a corporation

      The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

4

2. The Defendant(s)

   a. If the defendant is an individual

      The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. *Or* is a citizen of *(foreign nation)* _____.

   b. If the defendant is a corporation

      The defendant, *(name)* XCube Research and Development, Inc, is incorporated under the laws of the State of *(name)* New Hampshire, and has its principal place of business in the State of *(name)* New Hampshire. *Or* is incorporated under the laws of *(foreign nation)* _____, and has its principal place of business in *(name)* _____.

   *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

   The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

   The remaining 18 months of the terminated contract are worth $208,500 alone.

   The value of the shares which were lost could be worth up to $2,958,000.

   In sum, that is $3,166,500.

5

The defendant, John Roberts, is a citizen of the State of New Hampshire.

The defendant, Joseph Trier, is a citizen of the State of New Hampshire.

The defendant, Stephen Pytka, is a citizen of the State of Massachusetts.

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Please see attached.

**Factual Background**

1. I joined XCube R&D as Chief Product Officer in early February 2017. Shortly thereafter, Mikael Taveniku extorted a loan of $25,000 from me, by convincing me that his company, XCube R&D, of which he was the controlling shareholder, was in good financial shape and had a revolutionary, customer-tested technology. In fact, as I discovered incidentally when I was tasked with reconciling the company's books in August, the company had been effectively insolvent since December 2016, and the money of myself and other investors was primarily used to pay the salaries of engineers Joe Trier and John Roberts.
    a. Mikael and I signed the loan on March 8th, 2017. I then signed the loan over to the trust, of which I was the nominee.
    b. I signed a new employment agreement on February 27, reaffirming my title as Chief Product Officer, and with a substantially greater equity stake to reflect my deeper involvement despite the company's precarious state. However, it quickly became apparent that the technology was, and remains, totally undocumented and untested by any existing customers. The primary engineer and system administrator Joe Trier was evasive when I asked if the technology functioned at the petabyte scale it was advertised for.
    c. Nonetheless, Mikael reassured me that his technology was best in class and could generate at least $100 million in revenue easily. I continued to work for him, though I was paid only in small increments amounting to $7500 total, despite the fact I worked for seven months and my monthly salary was to be, according to my contract, $9,000 a month.
    d. It also transpired that the original Powerpoint deck Mikael showed me and his investors, with 22 prospective customers of substantial size and commercial wherewithal, was completely fictional. Neither Mikael, nor his sales partners, had direct contact with any of the companies listed, except for three.
    e. Consequently, the company's financial position began to deteriorate rapidly. I helped obtain approximately $320,000 in follow up investments, but they could not compensate for the lack of sales.
    f. I helped obtain investments from the most senior and accomplished technologists in the Boston area and some others. These included Eric Clayberg, head of Google in Boston; Michael Mark, Chairman of the publicly traded Progress Software who has had nearly thirty successful businesses; Bill Waters, one of the area's most successful radiopharmaceutical executives; Thomas Lichoulas, a real estate magnate; and 301 Ventures, the venture capital arm of the University of Maryland.
    g. I also helped forge relationships with senior technologists, who aided the company in various ways, including introductions to sales targets: Rich Napolitano, former CEO of the $4 billion EMC Middleware; Steve Papa, CEO of Parallel Wireless, who founded and sold Endeca to Oracle for $1.1 billion; Adam Ferrari, former CTO and co-founder of Endeca; and Bob Gleichauf, former Chief Scientist of In-Q-Tel, the CIA's venture capital arm.
    h. I helped convince Dan von Kohorn, the CEO of Wolfram Ventures to join the advisory board.

i. During this period, I was paid less than every other employee in the company. The engineers, Joe Trier and John Roberts, were paid their full salary of $10,000 per month until June, when money ran out and they quit. Mikael was given at least $12,500 from the company. I was paid a total of $7500 over seven months, which did not cover my basic living costs.
j. After Joe Trier left, he gave over the company's email administration to Mikael. This meant Mikael was able to monitor the emails of everyone else, and suggests he was conspiring with Mikael in his overall plan. In fact, Joe was the single greatest beneficiary of the investments we obtained, as he was paid $55,000 plus health insurance, social security, and 401k contributions.
k. During the company's decline, Mikael was nowhere to be found. He rarely answered emails, never answered phone calls, and accused me of never putting money into the company. Sales became impossible, between the totally undocumented technology and his failure to deal in a timely fashion with customers. For example, a contract with SL Corp that he promised to finish by the end of February took him until the end of May, and even then remained substantially unfinished.
l. In April, the CEO was able to get the company's potential acquisition value up to $30 million, but internally the company continued to deteriorate as neither the basic collateral nor manpower necessary for sales were present. Mikael's prevarication on the SL contract and general absence paralyzed the company.
m. Mikael refused to put us in touch with any of his contacts so we could continue the sales process. He protested that his business cards might be in an indistinguishable melange with the contact information of his prostitutes. Therefore I helped build up a sales pipeline including Ford, Argo AI, Intel, Bosch, and other multibillion dollar companies. Mikael demanded to be involved with these calls, and then would speak so badly that we had to expend considerable effort in repairing the relationship.
    i. At a meeting with some of the most senior venture capital investors from China, including one of the founding Baidu Ventures partners, who was also an ex-Goldman Sachs partner, Mikael spoke so badly that the head of the Chinese delegation had to ask XCube's CEO to request that Mikael to stop speaking. Mikael continued to speak for another ten minutes.
n. The effect of his behavior was to destroy the value of the equity in the company, including my own shareholding. We were unable to raise funding or make sales as long as he was involved. Michael Mark, one of our investors and one of the most lauded technologists in Boston, told us we should fire him if we wanted to be successful.
o. Ultimately, when Manfredi de Filippo attempted to call in the loan as protector of the trust to which it belonged, Mikael responded by firing myself and the company's CEO on August 28th, 2017. He was aided through all this by his lawyer Lester Riordan, his friend Stephen Pytka, and the engineers Joe Trier and John Roberts, who were part of the board meeting which decided to remove me from the company and refuse to repay my loan, of which Manfredi was protector.
p. Shortly afterwards, on the same day, Lester Riordan sent an email saying Mikael wanted to rehire me.

  q. The subsequent day, August 29th, 2017, Mikael attempted to hire me back. This indicated his approbation of my work, as long as I did not get paid or try to enforce any of my legal rights, such as demanding my mother's money be repaid.
  r. The essential tactic was to get me to sign a new employment agreement without the terms and protections of the previous one.
2. Subsequently, Mikael Taveniku began to tell third parties that the CEO and I had ruined the company by paying ourselves at the expense of everyone else and plotting to move the company into bankruptcy.
  a. In an email dated October 23, 2017 to a John-Mark Patterson of Euler Hermes, Mikael, with Les Riordan copied, claimed I was party to the CEO's plan to seize the company's accounts, kill XCube's sales pipeline, and that he was planning on filing legal action against me. These claims were entirely false:
    i. Mikael was in charge of all the bank accounts and signed all checks. He had access to XCube's business account with TDBank, as evinced by the fact he his own usernames on the account. I only obtained a username with access in August, when I had to examine the financials further. As far as can be discerned, Mikael closed this account in an attempt to eliminate any evidence of these facts.
    ii. I had sent thousands of emails attempting to make sales and corresponding with prospective customers, and had made journeys to California of my own expense to follow up with them.
    iii. I also sent many emails attempting to obtain follow up investment. For example, I emailed Beacon Angels member Bill Waters, and even taught myself how to use Quickbooks so I could generate a report for him to examine. Ultimately the financial situation of the company was too parlous for him to invest beyond the $75,000 the CEO and I already convinced him to give.
  b. In an email dated October 24, 2017 to a John-Mark Patterson at Euler Hermes, Mikael claimed that the CEO and I were the only ones paid by the company, and that my employment at the company was calculated to produce a bankruptcy. He adduced no evidence for either claim, and both claims were entirely false:
    i. Joe Trier had been paid $55,000, plus social security, healthcare, and 401k contributions. John Roberts had been paid $45,000, plus healthcare, social security, and 401k contributions. In total Mr. Roberts and Mr. Trier received around $150,000. Mikael had been paid at least $12,500. By contrast, I gave the company $25,000 as a loan and only took $7500 in contractually guaranteed salary.
    ii. Many of our sales and marketing activities were incurred on our own business cards with no reimbursement from the company, and we were ourselves creditors of the company. Mikael adduced no evidence that we would want to wipe out our own loans against the company or the value of our equity.
  c. All of Mikael's false claims, which could be easily disproven upon examination of the bank statements that had always been available to him, make clear that Mikael was trying to fabricate a false narrative injurious to my reputation to undergird a potential

        lawsuit claiming breach of fiduciary duty, as Les Riordan suggested in an email to Manfredi de Filippo.
   d. This also buttressed Mikael's strategy of blackmailing me so that I would give up my vested shares in XCube. He and Les Riordan know that I cannot afford my own legal representation, and hoped to browbeat me with lawsuits.
   e. As far as can be discerned, Mikael's strategy was to obtain money from myself and others to prop up his failing company, with the intent of firing me whenever things deteriorated sufficiently and I did anything contrary to his plan. John Roberts and Joe Trier were the greatest beneficiaries of his scam. Lester Riordan was copied on many of these emails, and it seems Mr. Riordan's primary interest was making sure that his client INI, an XCube creditor, be paid before any of the other creditors or investors.
   f. Mikael's defamations have made it very difficult for me to raise any money for future ventures, as well as use old suppliers in a new venture in this area.
   g. Moreover, Mr. Taveniku's September 8, 2017 email to Bill Swiggart, the managing partner of Beacon Angels, a major XCube investor, defamed me by claiming that I, in association with the CEO, had depleted the company of all cash. This has made it impossible for me to raise investor money in the future by destroying my reputation in the Boston investor community.
3. My contract stated that my employment was guaranteed for a "minimum period of two years" and that I would be paid $9,000 per month for that time. Therefore the termination of my contract – which was, per the contract, supposed to be mutual – means I am deprived of the remaining sum which was due. Subtracting the $7500 I was paid, that leaves an unpaid amount of $208,500.
4. As part of the above amount, I am owed $55,000 in unpaid wages. The New Hampshire Department of Labor decided that I won this claim and has given me authorization to seek redress in a court of law, as XCube R&D has been delinquent in paying this amount.
5. Mr. Taveniku has also fabricated a false W-2 and 1099, which do not correspond at all the payments made to me, whether according to the company's bank statements or my own statements. I believe he was trying to confect evidence that I had indeed been paid by the company.

# Complaint against John Roberts, Joe Trier, and Stephen Pytka: conspiracy to commit defamation

6. As recounted above, Mikael Taveniku defamed me in his October 23rd and 24th emails to John-Mark Patterson of Euler-Hermes when he claimed that I had intentionally tried to bankrupt the company and was the only one who had been paid. In fact, I had been paid the least of all employees, some of whom were paid nearly nine times what I was. Moreover, I had loaned the company nearly three times as much money as I was paid.
   a. Mikael's statements were maliciously made to buttress the overall strategy of suing me for breach of fiduciary duty to prevent me from enforcing my loan. He had

   initiated this strategy as early as September 8th, 2017, in an email to Bill Swiggart of Beacon Angels.
   b. Their end goal was to force me to give up my vested shares, as Mikael asked me to do in a text message on November 25th.
   c. Mikael was abetted in his endeavours by John Roberts, Joe Trier, and Stephen Pytka, who benefitted from his overall scheme of extracting loans and then refusing to repay them, a strategy which the defamation undergirded.
   d. The end result has been to badly damage my personal reputation in the startup ecosystem, and I can no longer raise money.

# Complaint against John Roberts and Joe Trier: conspiracy to commit fraudulent misrepresentation

7. Mikael Taveniku induced me to join the company by using a Powerpoint deck suggesting he had a pipeline of 22 major companies. In reality, neither he, nor XCube's sales partners, had actual contact with more than five of them, and whatever sales might be in play were in an incipient stage. None of them eventuated. They were represented as serious prospects.
   a. Mikael also lauded his supposedly groundbreaking technology, which was in extremely poor shape and totally undocumented.
   b. He convinced me to give a loan to the company on the basis of both his sales pipeline and his superb technology. His lawyer Lester Riordan has browbeat me, threatening me with lawsuits to prevent me from enforcing the loan.
   c. Joe Trier and John Roberts were the major beneficiaries of Mikael's scheme - to the tune of around $150,000 in compensation - as well as his consistent collaborators. They aided his overall scheme through actions such as giving over control of the email addresses to Mikael when they abandoned the company, facilitating his surveillance.
   d. The net effect of their misrepresentations was to induce me to loan the company $25,000 dollars and work despite being almost entirely uncompensated. I was underpaid by $55,000 according to the New Hampshire Department of Labor.

# Complaint against John Roberts, Joe Trier, Stephen Pytka: breach of contract, conspiracy to breach contract, conspiracy to breach fiduciary duty,

8. Mikael Taveniku, at the board meeting of August 28th, 2017, conspired with John Roberts, Joe Trier, and Stephen Pytka, to breach my contract with XCube by firing me without giving

me either my back pay or the future pay guaranteed under my contract. This amounts to $208,500 in damages.
9. John Roberts and Stephen Pytka, as directors of the company, had a fiduciary duty to see the company carried out its obligations, rather than being proxies for the plundering carried out by Mr. Taveniku and Mr. Trier. Indeed, John Roberts was a primary beneficiary of this scheme.
10. Their scheme resulted in the loss of $30 million dollars in value from the company. I owned 125,200 fully vested shares, with another 22,800 to vest over the minimum two years of my contract, for a total of 148,000 shares. These shares have lost all their value due to the actions of the defendants. At an authorized share count of 1,500,000 I would have owned 9.86% of the company. Given that an acquisition offer of $30 million was fielded, I lost $2,958,000.

# Complaint against XCube Research and Development, Inc.: non-payment of loan, breach of contract

11. According to the $25,000 loan signed on March 8th, the loan is callable at any time. Mikael Taveniku has made it clear XCube will not repay the loan, and that he will not respond to requests for repayment. Therefore I am suing for the unredeemed value of $25,000.

# Complaint against XCube Research and Development, Inc.: defamation

12. When Mikael Taveniku defamed to me to John-Mark Patterson of Euler Hermes, he was acting as President, owner, and principal of XCube R&D, my employer. Therefore XCube R&D is liable for his defamatory statements. To reiterate the facts of the defamation suit: Mikael Taveniku claimed that I had intentionally tried to bankrupt the company and was the only one who had been paid. In fact, I had been paid the least of all employees, some of whom were paid nearly nine times what I was. Moreover, I had loaned the company nearly three times as much money as I was paid.
   a. Mikael's statements were maliciously made to buttress the overall strategy of suing me for breach of fiduciary duty to prevent me from enforcing my loan. He had initiated this strategy as early as September 8th, 2017, in an email to Bill Swiggart of Beacon Angels.
   b. Their end goal was to force me to give up my vested shares, as Mikael asked me to do in a text message on November 25th.
   c. Mikael was abetted in his endeavours by John Roberts, Joe Trier, and Stephen Pytka, who benefitted from his overall scheme of extracting loans and then refusing to repay them, a strategy which the defamation undergirded.
   d. The end result has been to badly damage my personal reputation in the startup ecosystem, and I can no longer raise money.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages. For any request for injunctive relief, explain why monetary damages at a later time would not adequately compensate you for the injuries you sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation could not be measured.

I would like compensatory damages for the lost value of my contract, both in terms of salary and equity, amounting to $3,166,500. I would also request injunctive relief: that XCube's management be stopped from destroying the value of its equity or diverting its value into another vehicle through bankruptcy, and that XCube's agents be stopped from making further defamatory statements about me.

7

V.  **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.  **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 2/3 , 2018

Signature of Plaintiff _[signature]_
Printed Name of Plaintiff   Shantanu Jha

*(If more than one plaintiff is named in the complaint, attach an additional certification and signature page for each additional plaintiff.)*

B.  **For Attorneys**

Date of signing: _____, 20__.

Signature of Attorney        _____
Printed Name of Attorney     _____
Bar Number                   _____
Name of Law Firm             _____
Address                      _____
Telephone Number             _____
Email Address                _____

8